IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ISAIAH BELL, JR.,

                         Plaintiff,                    OPINION & ORDER

    v.

                                            12-cv-297-wmc

MICHAEL MEISNER et al.,

                         Defendants.

In this civil action, plaintiff Isaiah Bell, Jr., was originally granted leave to proceed with his claim that various staff members at Columbia Correctional Institution ("CCI") acted with deliberate indifference to his acute mental health problems and resulting suicidal behaviors. Bell was subsequently granted leave to proceed on a separate claim of excessive force against defendants Patrick Hooper and Nicholas Bredemann, as well as a claim of deliberate indifference against another defendant, Dr. Dalia Suliene. (*See* dkt. #15.)

Before the court now are defendants' motions for summary judgment. Defendants contend: (1) that Bell has failed to exhaust his administrative remedies with respect to his claim against Suliene (dkt. #36); and (2) that the undisputed facts and evidence require a finding that the other CCI staff members named in the complaint did *not* display deliberate indifference to Bell's needs and instead treated his serious mental health problems to the best of their ability (dkt. #42). Bell failed to respond to either motion for summary judgment. After reviewing the evidence, the court will now grant both of defendants' motions for summary judgment in their entirety.[1]

---

[1] Defendants have also moved to stay all pretrial proceedings and deadlines pending resolution of their motions for summary judgment. (Dkt. #59.) That motion will be denied as moot.

UNDISPUTED FACTS[2]

## I.  Parties

At all times material to this action, plaintiff Isaiah Bell, Jr. was confined at CCI, a Wisconsin Department of Corrections ("DOC") facility located in Portage, Wisconsin.  Bell has a history of aggressive behavior, causing self-harm and lengthy segregation placements. Relatedly, he has displayed at times a low frustration tolerance, impulsivity, poor coping skills and poor interpersonal skills.

Defendants Kevin Boodry, Nicholas Bredemann and Petar Karna are employed by the DOC as Supervising Officers 1 (Lieutenant) at CCI.  Their duties include ensuring the security, custody and control of CCI inmates, as well as supervising Correctional Officers and Correctional Sergeants.  Defendants Timothy Casiana, Donald Morgan, Paul Walker and Sean Salter are employed by the Wisconsin DOC as Administrative Captains at CCI. Administrative Captains are responsible for the security, custody and control of inmates. Casiana and Walker were also responsible for institution operations on an assigned shift, while Morgan regularly assumed responsibility for representing the CCI Security Department on a number of internal committees related to prison operations and management.  Morgan is also security liaison to the segregation units and has served as the segregation unit supervisor at times.

Defendant David Lipinski is employed by DOC as a Training Captain; he was previously employed as a Shift Relief Captain at CCI.  As a Shift Relief Captain, Lipinski was responsible for the security, custody and control of inmates, as well as institution operations on an assigned shift.  Defendant Dawn Laurent is currently employed by DOC

---

[2] As noted above, Bell has failed to respond to defendants' proposed findings of fact.  Accordingly, the court deems those facts undisputed.

as the Psychologist Service Unit ("PSU") Supervisor at CCI.  Defendant Dalia Suliene is a medical doctor employed by CCI.  Last, but not least, defendant Michael Meisner is the warden at CCI.

## II.  Safety Precautions at CCI

DOC institutions have put measures into place to help decrease inmates' risk of suicide and self-harming behavior.  Those measures include staff training, early identification of at-risk inmates, prompt intervention, effective treatment in accordance with professional judgment and standards, and staff collaboration.  At CCI, Programming Escort Officers, Security Supervisors and segregation staff have also received Crisis Intervention Training.  In addition, to help prevent self-harming behavior, CCI and DS-1 staff:

- Strip-search inmates before they enter segregation and before entering observation/control status,[3] to ensure they have no items that could cause disruption or enable them to self-harm.

- Search cells before placing inmates there, to ensure the cells are free of contraband and damaged items that inmates could use to cause disruption or self-harm.

- Inspect mail for contraband.

- Conduct frequent searches of inmate cells.

---

[3] Observation status is a restrictive status used to prevent inmates from inflicting harm upon themselves or others that is intended not as punishment but to protect the inmate and staff members.  During observation status, an inmate's property is restricted and staff visually check on the inmate (1) at least every 15 minutes if the inmate is housed in an observation cell, and (2) at least every 5 minutes if no observation cell is available and the inmate is housed in segregation.

- Conduct frequent rounds of the segregation unit to ensure that inmates are visible and are not harming themselves.

- Provide inmates with out-of-cell programming and counseling.

If an inmate presents safety concerns, he may be placed on restrictions to prevent self-harming behavior. These restrictions may be individualized depending on the inmate's specific self-harming behaviors. Like observation status, restrictions are not meant to be punitive but are instead intended to manage inmate behavior when that behavior poses a serious risk to the health and safety of the inmate and/or others.

If a staff member observes an inmate harming himself, he instructs the inmate to stop while maintaining a constant visual. Security staff will then survey the scene, secure the area and alert additional staff. When it is safe to open the cell door, the inmate is removed from the cell and provided with PSU and/or HSU services as necessary.

If it is determined that additional steps are necessary to prevent self-harm – for example, if an inmate threatens to harm himself or does harm himself – he is placed in observation status within the DS-1 unit. A clinician, crisis intervention worker, physician, registered nurse, physician's assistant or the warden may place an inmate on observation status; if a clinician, crisis intervention worker or physician is unavailable for consultation, the security director or a security supervisor may also place an inmate in observation status. If PSU deems it necessary, an inmate may be placed on constant observation, with a staff member maintaining continuous line-of-sight monitoring, or in restraints.[4] The unit team

---

[4] Pursuant to Wis. Admin. Code § DOC 306.11(1)(b), staff may use mechanical restraints "to confine inmates only with the express authorization of the shift supervisor and only in [certain] circumstances," including "[t]o protect an inmate who poses an immediate threat of physical injury to self unless restrained." "The warden shall not allow an inmate to remain in restraints for longer

weekly reviews all inmates in the segregation building, to ensure that subtle changes are shared and follow-up is pursued when necessary.

## III.  Mental Health Care Provided to Bell

At all times relevant to this lawsuit, Bell was under the treatment of psychological services staff.  Defendants' proposed findings of fact indicate that Bell was seen on multiple occasions.  (*See* DPFOF (dkt. #44) ¶¶ 483-560.)  He has been transferred to the Wisconsin Resource Center ("WRC") on multiple occasions and has received dialectical behavior therapy ("DBT").  While sometimes he received care for thoughts and threats of self-harm, (*id.* at ¶ 560), at other times, he indicated he was doing better, behaved cooperatively and utilized the skills he was learning in therapy, (*id.* at ¶ 561).

## IV.  Specific Instances of Self-Harm

As defendants note, Bell's complaint does not allege (1) any particular occasion on which he was at substantial risk of harm or (2) any single defendant who knew of that risk but failed to intervene.  Defendants have nevertheless identified several, specific incidents in which Bell harmed himself and have proposed facts with regard to each incident and the days preceding it.  The court reviews those incidents below.[5]

---

than 12 hours, unless the inmate is examined by a licensed psychologist or a designee acting under the supervision of the licensed psychologist, or a psychiatrist, and a member of the medical staff who shall make a recommendation to the warden concerning the inmate's continued placement in restraints." *Id.* at § DOC 306.11(3)(e).

[5] Defendants' briefing focuses only on those instances in which Bell filed an Offender Complaint, perhaps on the assumption that Bell can only have exhausted his administrative remedies with respect to those incidents, but their proposed findings of fact include other instances in which Bell harmed himself as well.  Prisoners "need not file multiple, successive grievances raising the same issue (such as prison conditions or policies) if the objectionable condition is continuing." *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013).  Because some of Bell's allegations relate to supervisory defendants' failure to train subordinates and intervene in ongoing Eighth Amendment violations, the

## A. February 27, 2011

On February 27, 2011, Boodry was informed that Bell was threatening to cut himself and displaying an unidentified piece of metal. Bell had recently returned from Divine Savior Hospital, where he had been treated for cutting himself, and was in Observation status with direct officer monitoring. Boodry approached the cell with Officers Haag, Julson and Hooper and asked Bell to show him the laceration and the tool he was using. Bell showed Boodry his left forearm, which had a two-inch laceration from the previous incident, and Boodry asked Bell to pass out the metal. Bell stated that he had swallowed it. Boodry asked Bell to place his hands out of the trap to be restrained, and Bell complied.

Bell made verbal threats to continue his suicide attempts and requested placement in full-body restraints. HSU staff arrived to provide medical attention, but Bell refused treatment. Boodry contacted the on-call PSU clinical resource, Dr. Trinidad, and briefed him on the situation. Bell stated he would "be good the rest of the night" if he could have a smock and see someone in the morning. Dr. Trinidad agreed Brody should provide Bell with a smock if he handed out the metal, and that Trinidad would then see Bell in the morning. Boodry believed that Bell could be trusted to keep his word.

Bell was then escorted back to his cell after a medical evaluation. He handed over the metal and was given a smock. Bell again confirmed that he would not harm himself, and Boodry assured Bell that Dr. Trinidad would see him in the morning. Bell was maintained on direct observation for the remainder of that shift.

---

court briefly reviews even those facts that do not relate to one of the specific instances about which Bell filed a grievance.

### B. September 22, 2011

On September 20, 2011, Bell was seen in the DS-1 dayroom by Dante and O'Neill of the WRC Outreach Team.  Bell reported frustration with his lack of progress, but said that he had been successful in avoiding harming himself or others.  Bell also discussed some of the DBT skills he had been using to cope.  Bell was informed that if he kept up the good work, he could be referred to WRC by the end of the month.

On September 21, 2011, psychiatrist Gary Maier examined Bell with defendant Dr. Kumke.  Maier noted that Bell reported he was doing fine, did not need medication and did not want to follow up.  Maier agreed and observed that Bell "appear[ed] to be in a stable period at the present time."  (*See* Laurent Decl. Exh. 1009 (dkt. #51-3) 245.)

On September 22, 2011, defendant Officer Hooper was on routine patrol of the DS-1 unit and approached cell #45, where Bell was housed.  Bell was again on observation status at that time.  As Hooper approached, he saw Bell cutting his left forearm.  Before this point, Hooper had no warning that Bell planned to commit an act of self-harm.  Hooper directed Bell to stop cutting himself and hand out the object he was using.  In response, Bell stopped cutting but refused to hand out the object, which turned out to be a broken piece of toothbrush.  Bell also stated he had broken up two toothbrushes earlier in the day and had swallowed them.  Hooper then informed the unit Sergeant, who in turn informed his supervisors.  In the meantime, Hooper watched as Bell ingested the pieces of toothbrush.

Defendant Lieutenant Boodry responded to the unit and instructed Hooper to continue his observation of Bell.  Hooper observed Bell retrieve additional pieces of toothbrush and again asked Bell to give him the pieces.  Instead, as Hooper was speaking

with him, Bell made another cut on his right inner arm and then swallowed the additional toothbrush pieces as well.

Defendant Captain Casiana arrived on the unit shortly after.  Bell agreed to hand out the toothbrush pieces to him, giving him three pieces he had regurgitated.  Bell then agreed to be restrained with wrist and leg restraints and was escorted to the DS-1 dayroom, where he was given basic first aid treatment.  He was then escorted back to cell #45 without further incident.

### C. October 14, 2011

On September 30, 2011, Bell submitted a PSR form stating he did not want any contact with the Psychologist Service Unit.  Dr. Kumke responded on October 3, 2011, requesting that Bell touch base with him, even if just briefly.  That same day, Bell submitted a PSR form, threatening to kill anyone who came to his door to talk.

On October 4, 2011, Dr. Baird was speaking with another inmate when Bell requested to be seen briefly at his cell door.  Bell was smiling.  When asked about the PSR form, Bell laughed and stated he was frustrated and did not like working with his unit clinician.  Baird encouraged Bell to (1) remember the big picture and his goals, and (2) "get back on track." while Bell acknowledged some thoughts of self-harm at that time, but reported having no plans to do anything to harm himself.  On October 11, Bell was seen for an appointment.  Bell again admitted thoughts of cutting but said he had been able to refrain from self harm.  During the session, DBT skills were reviewed.

On October 14, 2011, Hooper was informed that Bell was again cutting his arm with a piece of toothbrush.  Hooper immediately responded, at which time Bell swallowed the

toothbrush.  The Unit Sergeant was notified.  Defendant Lieutenant Boodry asked Bell to agree to hand out the toothbrush, but he refused.  Bell was then directed to turn around and place his hands out of the trap to be restrained for escort.  He complied and was escorted to the DS-1 dayroom, where HSU staff conducted a medical assessment.  Boodry also contacted the on-call PSU clinician, Dr. Johnson, who approved an observation placement with direct officer monitoring.  In the meantime, HSU staff informed Boodry that Bell required further medical treatment at Divine Savior Hospital, who was then transported accordingly.

On return to CCI, Bell was placed into clinical observation status with direct visual monitoring.  Within 30 minutes, Bell regurgitated the toothbrush, removed his bandage and began to cut himself again.  Boodry responded, and PSU staff were notified.  Boodry advocated for full-bed restraints; Dr. Johnson agreed and recommended a full-bed restraint placement.  After Bell was placed in restraints, he informed Boodry that he no longer wanted to hurt himself and wanted to try to regurgitate the toothbrush he had swallowed. The restraints were then removed and Bell was escorted to the observation shower, but he was unable to regurgitate the toothbrush.  Bell continued to try while placed back in observation status with direct monitoring.  Eventually, Bell succeeded in regurgitating the toothbrush pieces, which were secured.

### D. October 21 & 22, 2011

On October 20, 2011, Kumke saw Bell for a psychological services appointment. Bell indicated he was frustrated and did not believe he could go 90 days without self-harm. Kumke challenged this point of view, reminding Bell how much he had improved in the past

five months and encouraging him to use the DBT skills they were working on in their sessions.  He suggested that Bell break the 90-day requirement down into smaller, more manageable timeframes so that he did not feel overwhelmed.  Bell also asked about the possibility of transfer, and Kumke responded that it was a security decision and would not solve his problems.  Bell stated he would continue to work hard on challenging his thinking and managing his emotions.

On October 21, 2011, Captain Casiana reported to DS-1 in response to a report that Bell had a piece of metal and refused to relinquish it.  Casiana explained to Bell that he was on sharps restriction and had to relinquish the metal.  Bell refused to comply and threatened to harm himself.  PSU was contacted in response.  Following a consultation, Dr. Trinidad approved Bell's placement on observation status.  Casiana counseled Bell about the placement, but Bell refused to comply with escort and search procedures or to relinquish items.

A Cell Extraction Team, including Officers Armson and Pitzen and defendants Officers Haag and Hooper, was then summoned and donned protective equipment.  At that point, Bell began to insert a foreign object into his groin and Pitzen directed Bell to stop.  When Bell continued, Sgt. Royce approached with a Taser.  Bell then complied with all directives and was stabilized, placed in restraints and searched.

During this search, defendant Officer Wiley located a straightened staple.  Bell was then escorted to the DS-1 dayroom and temporarily stabilized in a restraint chair, and HSU staff completed a medical assessment.  After they determined that Bell had a foreign object in his groin and required outside medical attention, Bell was transported about 10:50 P.M. and returned at approximately 12:51 A.M. the next day.

10

Within minutes of placement back in a cell at CCI, Bell reportedly began biting his arms. Following a consultation with PSU, it was determined that Bell would be placed in immobilizing restraints. Bell complied with directives and was placed in restraints by Lt. Bredemann and Officers Haag, Hooper and Sandberg. HSU completed another medical evaluation, while PSU completed an initial evaluation. Bell threatened to hurt himself as soon as he was released, so he was maintained in immobilizing restraints with observation checks.

After release, Bell apparently engaged in further self-harming behavior on October 22, 2011, although no named defendants were involved in those incidents.

**E. February 3, 2012**

On February 3, 2012, at about 2:00 P.M., defendant Karna was notified that Bell was swallowing pieces of caulk peeled from the bottom of his cell door and also using them to cut himself. Karna called for support staff, apparently including defendant Sean Salter, and went to Bell's DS-1 unit. Having dealt with Bell before, Karna knew that if Bell promised not to harm himself for a short period of time, Karna could likely get him to agree to leave his cell. When Bell promised not to commit any acts of self-harm for the next five minutes, Karna left the cell front with an officer continuing to monitor Bell. After a few minutes, Karna returned, and Bell then agreed to leave his cell.

Because Bell also asked to see a clinician and be "strapped down," Karna contacted PSU. Dr. Buhr spoke with Bell while HSU staff treated the cuts on Bell's arm. Because Bell continued to threaten to harm himself, and HSU determined that he needed treatment

at Divine Savior Hospital, Bell was transported there, treated and released.  Upon returning to CCI, Bell was returned to constant observation status without further incident.

Also sometime on February 3, 2012,[6] Salter responded to the DS-1 unit after being informed that Bell had (1) covered his window with his sheets and mattress, (2) flooded his cell and observation area, and (3) refused to respond to directives to uncover his window. Salter attempted to gain verbal compliance from Bell to uncover the window and come out of his cell.  Bell not only refused, but also threatened that someone would be hurt and that he was going to commit suicide.  Salter then contacted PSU and spoke with Dr. Buhr. Since Bell indicated he had cut his left forearm, HSU and Security Director Nickel were also contacted.  After Nickel authorized the use of force if it became necessary, Salter assembled a cell extraction team of Sgt. Cichanowicz, Officer Bower, Sgt. Hart, Officer Bittelman, Officer Garrison and himself.  By this point Bell had barricaded his trapdoor with the mattress and loose clothing, and the cell floor had about 1 to 3 inches of standing water.  Even after Salter announced an extraction team was on site and authorized to use force if necessary, Bell continued to refuse staff directives.  In response, Salter forced open the trap door and applied a one-second burst of OC spray.  Bell then surrendered, placing his hands behind his back and out the trapdoor.  He was placed in mechanical restraints and offered a shower.  Bell refused to shower but requested to be seen by HSU.  After HSU gave Bell a medical assessment, he was escorted to cell #48 and placed in clinical observation status.  Bell refused to respond when Salter asked if he needed additional medical attention, and so Salter and the extraction team returned to the DS-1 dayroom.

---

[6] It is unclear from the record which of these events took place first.

### F. June 21 to July 17, 2012

On June 21, 2012, Bell was again placed in observation status because he was considered a danger to himself.  On June 26, Bell was seen at his cell door on DS-1 and stated that he would remain on observation status for the full 45 days of his contract with the Wisconsin Resource Center at that time, so that he would not return to his self-harming behavior.

On July 1, Bell submitted a PSR form indicating that he needed "to die as soon as possible" and asked someone to help him die.  In response, PSU staff saw Bell while in observation.

On July 2, defendant David Lipinski was informed that Bell had covered his observation cell window and camera with toilet paper.  Lipinski directed Bell to uncover the window, but he refused.  Lipinski contacted the security director immediately and explained the situation; the director authorized the planned use of force, including incapacitating agents if necessary.  Officers Haag, Rickey, Rataczak and Kleeber, as well as Sgt. Millonig, donned protective gear and assembled.  Since Bell's window was uncovered by this time and smeared with a small amount of blood, Lipinski directed Bell to place his hands out of the trap to be restrained.  Instead, Bell raised his left arm to the window, and Lipinski observed a laceration of about two inches on his forearm.

When Bell again refused to place his hands out of the trap, Lipinski directed staff to open it and administer O.C. into the cell.  Bell blocked the trap with the security blanket, but the extraction team was able to grab it and pull it out.  Bell actively resisted until the extraction team removed the blanket from the cell, at which point he turned and placed his hands in the trap to be restrained.  Once removed, strip searched, and escorted to the

13

dayroom, Bell was offered medical attention.  Although he refused, HSU staff concluded that Bell should be transported to Divine Savior Hospital for stitches.  After refusing treatment there as well, Bell was transported back to CCI and placed in a restraint chair.  Dr. Buhr determined that Bell should be placed in full bed restraints for his safety; this was done without further incident.

On July 12, Dr. Caldwell-Bar of the clinical staff saw Bell to review his observation placement.  Bell indicated that he wanted to stay on observation because he felt suicidal.  He also threatened to kill himself if released from observation.  At that time, it was determined that Bell remained a danger to himself and should remain in observation.

On July 15, defendant Paul Walker was on duty as an observation checker on the DS-1 unit at CCI.  Walker assisted in escorting Bell back to his cell after "controlled observation" time in the DS-1 dayroom and remained at Bell's cell door.  Bell then went to the corner of the cell and put his hands up to his mouth, with his back to the door.  Walker instructed Bell to come back to the door; while Bell obeyed, he also appeared to place something in his mouth and swallow it.  Bell showed Walker that his arm was cut and bleeding.

Walker then notified defendant Captain Casiana, who came to the cell door.  Bell complied with orders to be secured and transported from his cell and was escorted to the DS-1 dayroom, where HSU assessed his wounds.  Bell was provided medical treatment by way of direct pressure and a dressing on his arm.  He was then escorted to Cell #46 and placed in restraints.  After Bell became combative, additional restraints were applied.  Direct observation of Bell continued afterward.

On July 16, Casiana was again called to the DS-1 unit to provide potential supervision of a special escort for Bell, who had sustained a substantial, self-inflicted wound to his left forearm.  HSU staff recommended transporting Bell to Divine Savior Hospital for treatment.  Officers Rataczak, Pitzen, Risen and Kopfhamer prepared Bell, who departed for the hospital at approximately 9:15 P.M.  Unfortunately, Bell refused treatment at the hospital and was returned to CCI.  While he was being searched upon his return, Bell removed the bandage over his wound despite being ordered not to do so and began bleeding again.  Bell again refused medical treatment, and HSU staff stood onsite to monitor the wound visually.  Bell was directed to await placement and complied as cell #48 was cleaned.  After Casiana consulted with Dr. Caldwell-Barr, Bell was eventually placed on one-on-one supervision in cell #48, while cell #46 was prepared for application of immobilizing restraints as a pre-planned response if they became necessary.

Within minutes, Walker, who was observing Bell, reported that Bell had regurgitated an object and reopened the wound on his forearm.  Casiana went to the cell and saw that Bell was bleeding.  Defendant Boodry then approached and ordered Bell to come to the cell door; he complied.   Mechanical restraints were applied, and Bell was escorted to the dayroom for additional medical evaluation.  Casiana applied direct pressure to Bell's wound.  Bell repeatedly stated he did not want medical treatment, and he was instructed that he would be placed in immobilizing restraints.  While he complied initially, he began resisting during the placement of the restraints.  Officers Fanara and Exner and Lieutenant Boodry applied downward pressure to secure Bell, while Officer Julson secured and stabilized his head.

15

After HSU completed a restraint assessment, PSU staff spoke with Bell about the placement. Dr. Buhr ultimately determined that Bell would remain on observation status. He also asked if Bell needed anything from HSU, to which Bell replied that he did not.

At approximately 8:00 P.M. that same day, defendant Lieutenant Bredemann responded to reports that Bell was again engaging in self-harm. Arriving at the DS-1 unit, Bredemann, Sergeant Kottka and Officers Ashton and Exner approached cell #48 and ordered Bell to come to the door to be restrained. Bell refused, but Bredemann ordered him to come to the trapdoor to be handcuffed or OC spray would be used. Bell complied, and the officers applied mechanical restraints. Bell reported that he was on a "suicide mission" and wanted to return to his cell; he also said he would continue to harm himself. Bredemann contacted his superiors to inform them of Bell's statements, and PSU was also notified. Bell reported feeling dizzy and nauseated but continued to refuse medical treatment. After HSU determined Bell required additional treatment at Divine Savior Hospital, the HSU nurse cleaned Bell's wound and applied a pressure bandage for transport.

Upon his return to CCI, Dr. Caldwell-Barr interviewed Bell, who stated that he did not want to go into restraints and requested direct observation instead. Bell was not making any further attempts to harm himself while in the restraint chair, but also refused to enter into a contract for safety. Nevertheless, Bell was placed on direct observation as requested. Within minutes, however, Bell had regurgitated an object and continued to cut himself. The observing officer called for staff assistance, but Bell swallowed that object as well, at which point Bell was placed in restraints.

On July 17, 2012, at 3:10 P.M., Casiana received a report of a self-harm issue. Officer Julson reported observing Bell reopen his wound with an unknown object and

16

ordering Bell to stop.  Bell refused to comply, and Casiana responded.  Finding that Bell was bleeding, Officers Christensen, Exner and Kearns were summoned, and Julson ordered Bell to the cell door to be restrained.  Bell complied, and mechanical restraints were applied. Bell was then escorted to the DS-1 dayroom for HSU evaluation, while his wounds were treated by HSU nurses.  Bell was later transported to Divine Savior for further medical treatment, where he was treated and released.

At 4:55 P.M. that same day, Dr. Caldwell-Barr determined that Bell needed to be placed in immobilizing mechanical restraints.  With the restraints applied, HSU nurses conducted a medical assessment of the restraint system.  Dr. Caldwell-Barr spoke with Bell, and upon completion of this full assessment, staff exited the cell, with Bell continuing under direct observation.

## V. The Strip Search

On December 6, 2011, Bell was again on observation status.  Bredemann informed him that he was to be moved from a DS-1 observation cell to a cell on the range.  Bell refused, saying that he had placed staples in his penis and swallowed pieces of a broken soap dish and would recover those items to commit self-harm if moved.  Bredemann notified psychological services, and Drs. Kumke and Schwebke, both defendants, arrived.  Bell continued to refuse to be moved, and Schwebke recommended that Bell be placed in clinical observation status.

Bredemann notified Security Director Nickel of the incident, and she authorized a Cell Entry Team if Bell would not comply with the placement.  Bell then agreed to be seen

by HSU and placed into clinical observation status.   Bell was subsequently placed in mechanical restraints and removed from his cell.

At this time, defendants Hooper and Morgan, as well as non-defendants Neumaier and Kratz, conducted a staff-assisted strip search, which was video recorded by defendant Officer Brown.  During the search, the officers removed Bell's segregation shirt and searched him to ensure he was not secreting contraband.  Having made that determination, they concluded the search, secured Bell with mechanical restraints, placed a towel around his waist and escorted him to the dayroom to be examined by HSU staff.

After HSU staff determined that Bell required treatment at the UW Hospital CSC emergency room, Bredemann notified PSU of Bell's threats; PSU determined that Bell would be placed in Clinical Observation status; and Bell was escorted to the hospital without further incident.

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

18

Once the initial burden is met, for an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Nor may the nonmoving party "merely rely on conclusory pleadings" to withstand the motion. *Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 361 (7th Cir. 1987). Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If, as here, plaintiff fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'" *Id.* at 323.

## I. Administrative Exhaustion

The PLRA, 42 U.S.C. § 1997e(a), provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." In the Seventh Circuit, "[e]xhaustion of administrative remedies . . . is a condition precedent to suit." *Dixon v. Page*, 291 F.3d 485, 488 (7th Cir. 2002); *see also Perez v. Wis. Dep't of Corr.*, 183 F.3d 532, 535 (7th Cir. 1999) (holding that where administrative remedies have not been exhausted, "the district court lacks discretion to resolve the claim on the merits"). Additionally, the PLRA requires "proper exhaustion; that is, the inmate must file a timely grievance utilizing the procedures and rules of the state's prison grievance process." *Maddox v. Love*, 655 F.3d 709, 720 (7th Cir. 2011) (internal quotation marks omitted).

Wisconsin makes administrative remedies available to inmates under the Inmate Complaint Review System (ICRS). Under the ICRS, an inmate must file a complaint with the Institution Complaint Examiner (ICE) within 14 calendar days after the occurrence giving rise to the complaint. *See* Wis. Admin. Code § DOC 310.09(6). After the ICE reviews the complaint, he or she recommends action to a reviewing authority. *See id.* at § DOC 310.11(4), (11). The reviewing authority then makes a decision within ten working days of receiving the recommendation. *See id.* at § DOC 310.12. Inmates unsatisfied with a reviewing authority decision may appeal that decision to the corrections complaint examiner (CCE) within 10 calendar days. *See id.* at § DOC 310.13. The failure to take each step required by these administrative rules means the prisoner has failed to exhaust his administrative remedies. *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002).

Here, defendants have moved for summary judgment on Bell's Eighth Amendment claim against Dr. Dalia Suliene, on the grounds that he failed to exhaust his administrative remedies with respect to that claim. The basis for his complaint against Suliene is Bell's allegation that he ingested his asthma inhalers, resulting in severe pain, and that Suliene ignored his requests to have the inhalers surgically removed. (*See* Compl. (dkt. #1) ¶¶ 29-34.) Defendants have submitted an affidavit from ICE Ryan Blount, who has averred that Bell did not file: (1) any complaint regarding pain and cramps from ingestion of his inhaler; (2) any complaint that Suliene ignored his request to have his inhaler surgically removed; or (3) any complaint involving Suliene at all. (*See* Ryan Blount Affidavit (dkt. #38) ¶¶ 11-13.) In light of Bell's failure to offer any evidence to the contrary, the court finds that Bell has failed to exhaust his administrative remedies with respect to this claim and will enter summary judgment in defendant Suliene's favor.

20

## II. Merits

Defendants have also moved for summary judgment on the merits of plaintiff's Eighth Amendment claims against all defendants except Suliene.   Given the undisputed facts set forth above, the court concludes that all defendants are entitled to judgment as a matter of law.

When prison officials are aware that an inmate is at substantial risk of harm, including self-harm, the Eighth Amendment requires that they take reasonable steps to prevent that harm.   *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001).   For defendant to prevail on his Eighth Amendment claim here, he must specifically prove: (1) that he suffers from a serious medical condition; and (2) that the defendant had the requisite mental state, which is "one of deliberate indifference to inmate health or safety." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

Deliberate indifference is a high bar for plaintiff to clear, requiring proof that the defendant have actually known of a substantial risk of harm to the inmate, and either acted or failed to act in disregard of that risk.   *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002).   When the harm at issue is "suicide or attempted suicide, [deliberate indifference] requires a dual showing that the defendant (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006).   Moreover, a "prisoner's dissatisfaction with a *doctor's* prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition.'"   *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (emphasis added).   "Mere negligence or even gross negligence does not

21

constitute deliberate indifference." *Id.* at 590; *see also Oliver v. Deen*, 77 F.3d 156, 159 (7th Cir. 1996) ("Medical malpractice . . . is not a violation of the [Eighth] [A]mendment.").

Here, based on the undisputed facts set forth by defendants and accepted by default for purposes of their motion for summary judgment, there is insufficient evidence for a reasonable jury to find that any of the defendants acted with deliberate indifference toward Bell.  In some cases, defendants have averred that they had no warning before Bell began to engage in self-harm.  (*See, e.g.*, Boodry Decl. (dkt. #47) ¶ 61.)  Without actual knowledge that Bell was at substantial risk of committing or attempting suicide, defendants cannot be liable for these occurrences.[7]  In other cases, Bell apparently did warn defendants he was going to harm himself, but in none of those instances does it appear defendants failed to take reasonable action, much less taunted him to encourage further self-harm as Bell alleges in his complaint.  Nor does it appear that defendants made other statements evincing indifference to his plight or engaged in any other action (or inaction) that would permit a reasonable jury to find deliberate indifference.

To the contrary, the undisputed facts before this court show that (1) security staff members promptly relayed Bell's threats of self-harm or actual self-harming behavior to their superiors; (2) their superiors acted appropriately under the circumstances, including notifying HSU as necessary; and (3) CCI doctors and other health providers responded reasonably to Bell's immediate health and psychological needs, in addition to setting up

---

[7] While knowledge may sometimes be inferred from the very fact a risk is obvious, *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996), the court declines to infer that defendants had actual knowledge of substantial risk *at all times* based only on Bell's (admittedly severe) history of mental problems and self-harm, particularly since it appears from the record that (1) Bell also had periods of stability and improvement and (2) even during periods when he expressed both desire and means to commit self-harm, Bell would fairly regularly and reliably bargain away both the desire and the means in exchange for some concession by defendants.

various treatment plans to deal with Bell's tendencies toward self-harm over the longer term. Specifically, defendants have provided affidavits indicating that each time Bell warned he was feeling inclined toward harming or was going to harm himself, defendants took some action to protect him, whether by maintaining continual observation of Bell, alerting supervisors, directing Bell to stop harming himself and relinquish the objects he was using or secreting, extracting Bell from a harmful setting, placing Bell in restraints or utilizing some combination of the above.  Those affidavits remain uncontroverted by Bell.  Accordingly, no reasonable jury could find that defendants behaved with deliberate indifference toward Bell's self-harming behavior.[8]

To the extent that Bell's claims are predicated on the failure to place him in restraints *every* time he threatened to harm himself, (*see* Compl. (dkt. #1) ¶ 21), defendants rightly point out that Bell has a constitutional right to be free from bodily restraint that survives incarceration.  *See Youngberg v. Romeo*, 457 U.S. 307, 316 (1982).  Where that right intersects with Bell's conflicting right to treatment -- that is, the "right *to be restrained* so that he would not injure himself" -- is "a matter of medical judgment."  *Estate of Cole by Pardue v. Fromm*m 94 F.3d 254, 262 (7th Cir. 1996) (emphasis in original).  Thus, liability "may be

---

[8] Bell's failure to identify any specific incident(s) giving rise to his claim means that it is wholly unclear whether most of the defendants were personally involved in the claimed constitutional violations.  "A plaintiff bringing a civil rights action must prove that the defendant personally participated in or caused the unconstitutional actions."  *Alejo v. Heller*, 328 F.3d 930, 936 (7th Cir. 2003).  Here, Bell has alleged only that Martin, Cichanowicz, Schneider, Calhoun, Nichols, Wiley, Haag, Schraufnagel, Leitner, Walker, Schultze and Brown (formerly the John Doe defendants) have "at one time or another" failed to protect him; that Lipinski, Casiana, Salter, Higbee, Karna, Schoenenberg, Bredemann and Boodry have "at one time or another" failed to protect him and turned a blind eye to his self-harming behavior "on many occasions"; that Schwebke, Baird, Kumke, McLaren and Tobiasz have "on separate occasions" failed to protect him; and that Meisner, Nickel, Morgan and Ashworth have been generally "derelict in their duties."  (*See* Compl. (dkt. #1) ¶¶ 19-23.)  These conclusory allegations are not enough to show a genuine dispute of fact as to defendants' personal involvement in the alleged violations, much less to show an individual defendant's actions or inactions rise to the level of deliberate indifference.

imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* (quoting *Youngberg*, 457 U.S. at 323 (footnotes omitted)).

There are simply no facts in the record to support such a finding.  Again, to the contrary, defendants have averred without contradiction that they protected Bell to the best of their ability, and in cases where they chose not to physically restrain Bell, that decision was based on a belief that he was not in immediate danger of harming himself.  (*See, e.g.*, Boodry Decl. (dkt. #46) ¶¶ 25-30.)  Such determinations, even if negligently reached and ultimately proved incorrect, do not run afoul of the Eighth Amendment.  Here, the record does not even support a finding of negligence.

Similarly, Bell's claims against supervisory staff members Meisner, Nickel, Morgan and Ashworth, which are premised on their alleged failure to intervene, fail as a matter of law.  Based on the undisputed facts, since none of the *non*-supervisory defendants behaved with deliberate indifference toward Bell's suicidal behaviors, it follows that their supervisors are not liable for failing to intervene, at least on the record here.  Even if this were not so, plaintiff has again offered nothing supporting a finding of deliberate indifference by any supervisory defendant.

Finally, Officer Hooper is also entitled to summary judgment on Bell's claim that Hooper sexually harassed him during a strip search.  The Eighth Amendment prohibits "only those searches that are maliciously motivated, unrelated to institutional security, and hence totally without penological justification." *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004).  Here, defendants have averred that Bell was searched only long enough to

24

determine that he was not secreting contraband before being placed in clinical observation status. Not only is this a legitimate penological justification, particularly given that "[p]rison officials must be accorded wide-ranging deference in matters of internal order and security," *Meriwether v. Faulkner*, 821 F.2d 408, 417 (7th Cir. 1987), but Bell also has long and distressing history of secreting objects he later uses to harm himself. Given the contemporaneous threats of self-harm or harm to others that Bell has made, the court has no difficulty in crediting defendants' justification for the strip search, nor can it find any record evidence to discredit it, which defeats Bell's Eighth Amendment claim. Indeed, on this record, the only fault the court could possibly have found would have been defendants' *failure* to conduct a thorough search of plaintiff. Without any accompanying inappropriate behavior, Officer Bredemann is similarly without fault as a matter of law in allegedly failing to intervene in a search so obviously conducted for a legitimate penological reason.

## ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment for failure to exhaust administrative remedies (dkt. #36) is GRANTED.

2) Defendants' motion for summary judgment (dkt. #42) is GRANTED.

3) Defendants' motion to stay (dkt. #59) is DENIED as moot.

4) The clerk of courts is directed to enter judgment and close this case.

Entered this 12th day of February, 2014.

BY THE COURT:
/s/
_____
WILLIAM M. CONLEY
District Judge

25